

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00261-CR

Jose Manuel **VILLAGRAN**,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 437th Judicial District Court, Bexar County, Texas
Trial Court No. 2021CR3653B
Honorable Melisa C. Skinner, Judge Presiding

Opinion by:     Liza A. Rodriguez, Justice

Sitting:         Patricia O. Alvarez, Justice
                 Liza A. Rodriguez, Justice
                 Lori I. Valenzuela, Justice

Delivered and Filed: January 17, 2024

AFFIRMED

Jose Manuel Villagran was convicted by a jury of aggravated robbery. On appeal, he argues that his trial counsel rendered ineffective assistance of counsel by failing to request an instruction on the defense of necessity in the jury charge. We affirm the trial court's judgment.

### BACKGROUND

The complainant testified at trial that before the incident on December 20, 2020, she was friends with Villagran and they would go to gaming rooms and use illegal drugs together. According to the complainant, they often did favors for one another. On the afternoon of December

20, 2020, she received a call from Villagran. Villagran said "he had got into an argument with his . . . girlfriend and . . . needed a ride." "[H]e had all his bags with him." The complainant testified she agreed to give Villagran a ride if he bought twenty dollars of gasoline for the pickup truck she was using.

Sometime in the late afternoon or early evening, Villagran asked the complainant if they could also pick up his girlfriend Christina. According to the complainant, Villagran drove her pickup truck to the place they were meeting Christina because he was familiar with the location. After picking up Christina, they went to a gas station for fuel. Villagran and Christina went inside the convenience store to pay for the gasoline while she remained in the pickup truck. The complainant testified that while Villagran and Christina were in the store, she switched seats and slid into the driver's seat. Villagran and Christina walked out of the convenience store; while Villagran was pumping gasoline, he and Christina argued about something. The complainant testified she could not hear their argument because she had the windows up. Christina then walked behind the four-door pickup truck and got into the back passenger-side seat. The complainant noticed that Villagran had used the gas pump for a short time and saw that only five dollars of gasoline had been put into the tank.

Villagran opened the driver's side door and pushed her to the passenger's side. The complainant testified that she objected and told him she was driving. She also complained that he had not put the full twenty dollars' worth of gasoline into the tank. According to the complainant, Villagran drove the pickup truck slowly out of the gas station parking lot to a side street. She then yanked the pickup keys out of the ignition, causing the pickup truck to stop. The complainant testified that Christina, who was sitting behind her in the back passenger seat, grabbed her arms from behind and held her. The complainant testified that Villagran then "punched" her in the face, which caused her face to swell and bruise. The complainant had the pickup keys in her hand and

was holding on to them when her door opened and she fell out. The complainant testified that Christina, followed by Villagran, got on top of her and were trying to take the pickup keys from her. According to the complainant, she was on her stomach with her hand holding the pickup keys underneath her when Villagran grabbed her arm and pulled it back. Villagran was able to take the pickup keys from her but broke her arm in the process. Villagran and Christina then got back into the pickup truck and left her on the side of the road. She walked to the convenience store and got help. She testified that she was in the hospital for three days. According to the complainant, at no point did she take anything from Villagran or Christina. Video footage taken from the inside and outside the convenience store was admitted in evidence.

Christina, who was also facing charges in a different criminal proceeding relating to this incident, also testified. According to Christina, her fiancé Villagran picked her up on December 20, 2020. The complainant was also in the pickup truck. Christina testified that she and Villagran were supposed to provide twenty dollars of gasoline in exchange for the complainant giving them rides. However, at the gas station, Villagran pumped only ten dollars of gasoline. According to Christina, as the complainant was driving the pickup truck out of the gas station, the complainant was yelling at her and Villagran that they had not pumped the full twenty dollars of gasoline as agreed. Christina testified the complainant stopped the truck and started hitting Villagran, who was sitting in the back seat next to Christina. Christina tried to pull the complainant off of Villagran. According to Christina, the complainant took Villagran's storage keys from him and refused to give him his keys back. Christina testified, "So somehow we ended up outside the truck. There was a tussle . . . . I was trying to get [the complainant], like pulling her off me, and we ended up outside the truck because she wouldn't give the storage keys back to him." Christina testified that the complainant was hitting and biting Villagran and that Villagran "was just trying to get the storage keys, because [the complainant] knew where [Christina and Villagran's] storage [unit] was

[and] she knew [the] code to get into the storage [unit]." According to Christina, Villagran never hit the complainant. Christina admitted that she was holding the complainant but claimed that neither she nor Villagran hit the complainant. After Villagran retrieved the keys, he and Christina got into the pickup truck and left. On cross examination, Christina admitted there were two sets of keys: one for the complainant's truck and one for the storage unit. The keys were never combined.

Villagran testified that on December 20, 2020, he and the complainant agreed that she would give him a ride if he bought gasoline for the pickup truck, got her some cigarettes, and gave her "at least a gram of methamphetamines." He testified that after picking him up, he and the complainant went to his storage unit because he needed to get some clothes. According to Villagran, he and his fiancé Christina were homeless, and all their property was in the storage unit. After running a few errands, he then asked the complainant to pick up Christina. Villagran testified that when they picked up Christina, Christina became upset. According to Villagran, Christina was jealous because she believed he was cheating on her with the complainant. Villagran testified he had had sexual relations with the complainant, but Christina did not know for certain that he had cheated on her. At the gas station, he asked Christina to come inside with him. Christina was upset and believed the complainant had stolen a purse from her in the past. Because Christina would not give Villagran any money for gas, he paid for only six dollars of gasoline. Villagran testified the complainant was sitting in the passenger seat, and when he got back into the pickup truck, the complainant asked him why he had not pumped twenty dollars of gasoline and why he had not bought her a pack of cigarettes. Villagran testified he lied and said the debit card had not "go[ne] through." His plan was to stall the complainant, and he jumped out of the driver's seat, telling the complainant she could drive. He got into the back seat with Christina, and the complainant drove away. According to Villagran, the complainant then put the pickup truck into park in the middle of the side street and told him and Christina to get out of the pickup truck. Villagran and Christina

refused, and there was a "physical altercation between all three of [them]." Villagran testified, "[I]t just led one thing to another when Christina asked her, like I said, I don't know exactly what happened. All I know is that she wants us out of the truck, [and] we said no." According to Villagran, the complainant "assaulted" him, and "Christina pulled her off of" him. Villagran testified Christina and the complainant fell out of the pickup truck, and Christina said the complainant had his storage keys. Villagran saw his storage keys in the complainant's hand and "took them out of her hands." He denied injuring the complainant. He and Christina got back into the pickup truck, and the pickup truck keys were still in the ignition. Then, he drove away, leaving the complainant behind.

## INEFFECTIVE ASSISTANCE OF COUNSEL

We evaluate claims of ineffective assistance of counsel under the Sixth Amendment by considering (1) whether counsel was deficient, and (2) whether the defendant suffered prejudice as a result of counsel's error. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Hart v. State*, 667 S.W.3d 774, 781 (Tex. Crim. App. 2023). "To establish that counsel's actions were deficient, the appellant must show, by a preponderance of the evidence, that counsel's actions fell below an objective standard of reasonableness." *Hart*, 667 S.W.3d at 781 (citing *Strickland*, 466 U.S. at 687-88). "There is 'a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.'" *Id*. (quoting *Strickland*, 466 U.S. at 689). We "consider the reasonableness of counsel's actions at the time, rather than viewing such actions through the benefit of hindsight." *Id*. at 782. We "make this determination in light of all the circumstances in order to determine if the actions fall outside the wide range of professionally competent assistance." *Id*. (citing *Strickland*, 466 U.S. at 690).

"Claims of ineffective assistance must be firmly rooted in the record." *Id*. (citing *Thompson v. State*, 9 S.W.3d 808, 814 (Tex. Crim. App. 1999)). "Under most circumstances, the record on direct appeal will not be sufficient to show that counsel's representation was so deficient and so lacking in tactical or strategic decision-making as to overcome the strong presumption that counsel's conduct was reasonable and professional." *Id*. (citation omitted). "Given this fact, trial counsel should ordinarily be afforded an opportunity to explain his conduct before being denounced as ineffective." *Id*. "In the absence of such an opportunity, when faced with an undeveloped record on direct appeal, '[c]ourts commonly assume a strategic motive if any can be imagined and find counsel's performance deficient only if the conduct was so outrageous that no competent attorney would have engaged in it.'" *Id*. (quoting *Okonkwo v. State*, 398 S.W.3d 689, 693 (Tex. Crim. App. 2013)) (internal quotation omitted). "Counsel's actions are considered deficient only if the court finds, as a matter of law, that 'no reasonable trial strategy could justify trial counsel's acts or omissions, regardless of his or her subjective reasoning.'" *Id*. (quoting *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011)).

"To demonstrate deficient performance based on trial counsel's failure to request a defensive jury instruction, an appellant must show that he was entitled to such an instruction." *Id*. "However, even if the appellant is entitled to a defensive instruction, the decision to forgo such an instruction may not be objectively unreasonable, as these decisions are frequently grounded in trial strategy." *Id*. (citing *Okonkwo*, 398 S.W.3d at 697). "[J]ust because a competent defense attorney recognizes that a particular defense *might* be available to a particular offense, he or she could also decide it would be inappropriate to propound such a defense in a given case." *Id*. (quoting *Vasquez v. State*, 830 S.W.2d 948, 950 n.3 (Tex. Crim. App. 1992)) (emphasis in original).

Here, Villagran did not file a motion for new trial; thus, trial counsel did not have an opportunity to explain his trial strategy at a motion for new trial hearing. Accordingly, the record

on this direct appeal is undeveloped and fails to reflect counsel's reasoning. *See id*. at 783. ("This case falls into the category of ineffective-assistance claims raised on direct appeal for which the record is undeveloped because it does not adequately reflect counsel's reasoning."). Under these circumstances, we assume trial counsel had a strategic motive, "if one can be ascertained," and will find "counsel deficient only if his conduct was so outrageous that no competent attorney would have engaged in it or, stated differently, if no reasonable trial strategy could justify counsel's actions." *Id*.

Villagran argues his trial counsel's failure to request a necessity defense instruction fits in this category. According to Villagran, his testimony at trial was sufficient to raise a necessity defense instruction and his trial counsel was deficient by failing to make such a request. A defendant is entitled to an instruction on every defensive issue raised by the evidence regardless of the strength of the evidence. *Maciel v. State*, 631 S.W.3d 720, 722 (Tex. Crim. App. 2021). Pursuant to section 9.22 of the Texas Penal Code, otherwise criminal conduct is justified if:

(1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;
(2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by law proscribing the conduct; and
(3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

TEX. PENAL CODE § 9.22. "Necessity is a confession-and-avoidance defense, requiring the defendant to admit otherwise illegal conduct." *Maciel*, 631 S.W.3d at 723. "To be entitled to a defensive instruction [based on] necessity, a defendant must put on evidence that essentially admits to every element of the offense, including the culpable mental state." *Id*. (citation omitted). "In other words, a defendant cannot both invoke necessity and flatly deny the charged conduct." *Id*.

Villagran was charged with aggravated robbery. The indictment alleged that he "while in the course of committing theft of property and with intent to obtain and maintain control of said

property, *did intentionally and knowingly cause serious bodily injury* to [the complainant] . . . *by striking at the complainant with the hand of the defendant*." (emphasis added); *see also* TEX. PENAL CODE § 29.02 (providing that a person commits robbery if he, in the course of committing theft and with intent to obtain or maintain control of the property, "intentionally, knowingly, or recklessly causes bodily injury to another"); *id*. § 29.03 (providing that a person committed aggravated robbery if he commits robbery as defined in section 29.02 and "causes serious bodily injury to another"). Thus, to be entitled to a defensive instruction based on necessity, Villagran had to "essentially admit[] to every element of the offense, including the culpable mental state." *See Maciel*, 631 S.W.3d at 723 (citation omitted). As authorized by the indictment in this case, Villagran needed to admit he "intentionally and knowingly cause[d] serious bodily injury" to the complainant.

Villagran argues in his brief that he "confessed to violating the aggravated robbery statute by admitting to taking the truck after getting into a fight with" the complainant. While Villagran did admit to committing theft by taking the pickup truck, he did not confess to intentionally and knowingly causing serious bodily injury to the complainant as charged in the indictment. During his testimony, Villagran explicitly denied intentionally and knowingly causing serious bodily injury to the complainant:

Q: So then once they [the complainant and Christina] fall out of the [pickup truck], that's when you get out and you hit [the complainant] in the face, right?
A: No, ma'am.
Q: You don't hit [the complainant] on the right side of her face?
A: I did not.
Q: You—I'm sorry?
A: Yes.
Q: You did not hit [the complainant]?
A: I did not hit [the complainant].
Q: So again, you're telling me that you did not hit [the complainant]?
A: No, ma'am.
Q: So then you do recall telling Detective Drew, again, during your interview, that you did, in fact, hit [the complainant] in the face/mouth?

A: No, ma'am. In the video, if you were noticing yesterday, if anything, it was fast reflex, and I didn't hit intentionally. Because when she bit[] me—when you get bit by somebody, the reaction's going to be like yank it out.

Q: So, if she was hit in the face at all by you, you're saying it was just a reaction to her biting you?

A: But it would be in the face, because my hand was down here and she was biting me. It would be down here, not in the face.

Q: So was she driving around all day in that car with a giant swollen right cheek like we saw in those pictures?

A: No, ma'am.

Q: How do you think she got it? It was from you hitting her, right?

A: No, ma'am.

Q: And the scuffle continues, and then you ripped the keys out of her hand, right?

A: Yes, ma'am.

Q: And that's when you fractured her arm, right?

A: No, ma'am.

Q: You didn't pull so hard—you pulled—how hard did you pull her arm? Pretty hard?

A: The keys were easy to grab. So, I mean, she got—I got her [sic] unexpected with the keys.

A short time later, the prosecutor again asked Villagran, "And, after you ripped the keys out of her hand, which breaks her arm, you and [Christina] just leave her there in the street, don't you?" Villagran replied the same as he had before: "I didn't break her arm, ma'am. If—in the medical report she told the nurse that she fell. She didn't say that we assaulted her."

Because Villagran did not admit that he caused serious bodily injury to the complainant or that he did so knowingly or intentionally, he was not entitled to a necessity defense instruction. *See id*. Therefore, his trial counsel was not ineffective in failing to request it.

## CONCLUSION

Because Villagran was not entitled to a necessity defense instruction based on the evidence presented at trial, we overrule his sole issue and affirm the judgment of the trial court.

Liza A. Rodriguez, Justice

DO NOT PUBLISH